**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x
                 :

In re:                        :         Chapter 11
                 :

AIG FINANCIAL PRODUCTS CORP.,[1]   :        Case No. 22-11309 (_____)
                 :

          Debtor.            :
                 :

---------------------------------------------------------- x

**DECLARATION OF WILLIAM C. KOSTUROS,**
**CHIEF RESTRUCTURING OFFICER OF THE DEBTOR,**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, WILLIAM C. KOSTUROS declares as follows under the penalty of perjury:

1.       I am the Chief Restructuring Officer (the "**CRO**") of AIG Financial Products Corp., a corporation organized under the laws of Delaware ("**AIG FP**" or the "**Debtor**"), in the above-captioned case (the "**Chapter 11 Case**") and have served in such capacity since January 24, 2022. I am also a Managing Director at Alvarez & Marsal North America, LLC ("**A&M**"), a limited liability corporation, which has served as the restructuring advisor to the Debtor since January 24, 2022. I have over thirty years of financial restructuring and bankruptcy experience.[2] I have served as a Managing Director in A&M's Restructuring & Turnaround group since June 2002 and as the Vice-Chair of the U.S. Restructuring Practice since December 2020. I am over

---

[1]   The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number, is: AIG Financial Products Corp. (9410). The Debtor's address is 50 Danbury Road, Wilton, Connecticut 06897.

[2]   I have advised companies both in-court and out-of-court with respect to financial restructuring across a wide range of industries, including retail, consumer brands, financial services, and energy. I have also led complex engagements for companies, secured lenders and creditors, serving in both interim management and advisory roles. I have advised and/or served as a senior executive for, among others, Ascena Retail Group, Toys "R" Us, Cengage Learning, Inc., Washington Mutual, Inc., Movie Gallery, The Spiegel Group, and Target Canada.

the age of 18 and I am authorized by the Debtor to submit this declaration (the "**First Day Declaration**") on behalf of the Debtor.

2.      As part of overseeing the Debtor's preparations for the Chapter 11 Case, I was involved in advising on, and assisting with, the Debtor's day-to-day activities and transactions, including portfolio rebalancing and cash flow modeling, coordinating with counterparties, advising on the financial condition of AIG FP at various points in time, advising on the financial aspects of the Revolver Analysis (as defined herein), and managing the related diligence processes. In my capacity as CRO, I have familiarized myself with the Debtor's day-to-day functions, financial and business affairs, and books and records through review of key financial documents and discussions with management.  Except as otherwise stated in this First Day Declaration, the statements set forth herein are based on (i) my personal knowledge or my opinion based on my experience, (ii) information that I have received from the Debtor, my colleagues at A&M working directly with me or under my supervision, direction, or control, or other advisors of the Debtor, and/or (iii) my review of relevant documents.  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On December 14, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtor continues to manage its business as a debtor in possession.  No affiliates or subsidiaries of the Debtor, whether domestic or foreign, have filed chapter 11 petitions in connection with the Debtor's case.

29958241.1
US-DOCS\135839829

4.      I submit this First Day Declaration on behalf of the Debtor in support of its (i) voluntary petition for relief that was filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and (ii) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").  The Debtor seeks the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Case on its business and to facilitate the Debtor's reorganization.  I have reviewed the Debtor's petition and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted continuation of the Debtor's business and ongoing wind down and to successfully maximize the value of the Debtor's estate.

## PRELIMINARY STATEMENT

5.      AIG FP is a wholly-owned, direct subsidiary of American International Group, Inc. ("**AIG Inc.**" or "**Parent**").  AIG FP, a Delaware corporation founded in 1987 and based in Wilton, Connecticut, is a financial products company.  As discussed more fully in Part I.A below, AIG FP was founded for the purpose of trading in the capital markets and offering corporate finance, structured finance, and financial risk management products, including complex derivatives transactions.  While initially profitable, AIG FP suffered billions of dollars of losses from its derivatives trading positions during the financial crisis of 2008-2009 (the "**Financial Crisis**").  AIG FP has never recovered those losses.

6.      Following the Financial Crisis, AIG FP predominantly operated to manage and wind down the remaining transactions in its portfolio.  As of the Petition Date, AIG FP has assets totaling $315 million in book value, comprised of $216 million of intra- and intercompany receivables and investments in subsidiaries and the remaining $99 million consists primarily of a

credit linked note and $10 million in cash on hand.  It has liabilities of $37.7 billion in book value, comprised primarily of the AIG FP Revolver (as defined below) in the amount of $37.4 billion and $269 million of intra- and intercompany payables.  Thus, AIG FP is balance sheet insolvent by approximately $37.4 billion.

7.      Despite its insolvency, AIG FP has been subject to various lawsuits related to its Financial Crisis losses.  In 2014, former London-based executives of AIG FP brought a case against AIG FP in an English trial court seeking to recoup their deferred compensation account balances that were wiped out by AIG FP's Financial Crisis losses.[3]  That case was resolved in favor of AIG FP in 2020.  In 2019, a group of similarly situated executives filed suit against AIG FP in Connecticut seeking to recover deferred compensation that was wiped out by AIG FP's performance during the Financial Crisis.  As discussed more fully in Part III.B below, AIG FP successfully defended the English trial, which was dismissed, and AIG FP is continuing to vigorously defend the Connecticut litigation to date, but the defense has been, and will continue to be, costly, and time-consuming.

8.      After winding down for over 14 years, and with billions in valid liabilities, as well as additional costs to continue to defend the most recent Connecticut state court litigation (as discussed in Part III below), AIG FP determined that it was prudent to address its capital structure holistically.  To that end, in January 2022, AIG FP appointed an independent Special Committee (as defined herein) tasked with assessing the assets and liabilities of AIG FP and exploring potential strategic alternatives.  As a result, AIG FP, under the direction of the Special Committee,

---

[3]    The plaintiffs in the United Kingdom litigation sought, in connection with Plan Balances reduced and not restored, amounts totaling $90,799,648.00, £4,346,315.00 and €893,916.00, due to the fact that plaintiffs had elected to receive compensation in different currencies.

now commences this Chapter 11 Case to reorganize in order to maximize the value of its estate for the benefit of its creditors in order of contractual and statutory priority.

9.     To familiarize the Court with the Debtor, its business, the circumstances leading to this Chapter 11 Case, and the relief the Debtor is seeking in the First Day Pleadings, this Declaration is organized as follows:

- <u>Part I</u> provides an overview of the Debtor's business and organizational structure;

- <u>Part II</u> provides an overview of the Debtor's prepetition capital structure and indebtedness;

- <u>Part III</u> provides an overview of the circumstances leading to the commencement of the Chapter 11 Case by the Debtor; and

- <u>Part IV</u> summarizes the First Day Pleadings filed contemporaneously herewith.

I.     **THE DEBTOR'S BUSINESS AND ORGANIZATIONAL STRUCTURE**

   A.     **History of AIG FP**

      1.     ***Before the Financial Crisis:  Founding & Trading Activities***

10.     AIG FP was founded on January 27, 1987 as a joint venture between AIG Inc. and a group of Drexel Burnham Lambert bankers, led by Howard Sosin.  As envisioned by AIG Inc.'s then-CEO and Chairman, AIG FP was created to originate and sell complex derivatives, allowing AIG Inc. to access these markets in order to generate attractive returns on its capital.

11.     AIG FP was, at the outset, a small enterprise comprised of a team of approximately 13 traders.  AIG FP's offices were originally located in New York City, Westport, Connecticut and London, and eventually, the Westport office moved to Wilton, Connecticut.  At its peak in 2007, AIG FP had expanded with offices in London, Paris, Tokyo, and other locations and had 439 employees.

12.     On December 4, 1995, AIG Inc. and AIG FP entered into a General Guarantee Agreement (the "**Parent Guarantee**"), pursuant to which AIG Inc. generally agreed to guarantee

all of AIG FP's monetary obligations to counterparties.  With financial support from the superior balance sheet and credit rating of AIG Inc., AIG FP was able to strike advantageous deals in building its derivatives portfolio.

13.     Beginning in 1998, and with the express approval of AIG Inc.'s senior management at the time, AIG FP wrote credit protection through credit default swaps ("**CDSs**") on pools of mortgage-backed securities tied to subprime mortgage markets.  These transactions were unhedged and required the posting of collateral in the event the market value of the underlying mortgage-backed securities declined.  By the spring of 2005, the unhedged exposure on these CDS contracts had swollen to $40 billion.  In light of growing market risks, AIG FP tried to reduce risk and decided to stop writing new mortgage-backed CDSs in 2006.  Despite this decision, AIG FP's CDS portfolio was approximately $533 billion in total notional amount by 2007.

### 2.     *The Financial Crisis*

14.     AIG FP became a central figure during the Financial Crisis when its unhedged CDS positions, that had initially produced gains, turned into massive losses.  As the value of the underlying securities fell, AIG FP experienced unrealized losses on its portfolio and ultimately owed tens of billions of dollars of collateral postings. Those demands triggered a liquidity crisis at AIG FP and AIG Inc. because AIG Inc. had guaranteed AIG FP's monetary liabilities to those counterparties.

15.     On the morning of Monday, September 15, 2008—the same day that Lehman Brothers filed for chapter 11 protection—AIG Inc. met with representatives of certain financial institutions and the Federal Reserve Bank of New York (the "**Federal Reserve**").  Given the size, name, franchise, and market presence of AIG Inc. and its subsidiaries, including through its

insurance business, the Federal Reserve cautioned of a potential worldwide contagion should AIG Inc. become further impaired.[4]

16.    On the night of September 16, 2008, AIG Inc.'s Board of Directors approved borrowing from the Federal Reserve based on a term sheet that set forth the terms of a secured credit agreement and related equity participation, resulting in the extension of a $14 billion line of credit to AIG Inc.  Less than a week later, the Federal Reserve and AIG Inc. finalized the terms of that certain Credit Agreement, dated as of September 22, 2008 (the "**Fed Credit Agreement**" and the loan provided thereunder, the "**Fed Loan**"), providing for an $85 billion revolving line of credit to ensure that AIG Inc. and its subsidiaries could meet their immediate obligations.[5]

17.    As a result of and simultaneous with AIG Inc.'s receipt of the Fed Loan, on September 22, 2008, AIG Inc. entered into that certain Revolving Credit Agreement with its affiliate AIG Funding, Inc. ("**AIG Funding**"), whereby it extended $85 billion to AIG Funding to finance additional intercompany loans to direct and indirect subsidiaries of AIG Inc. (the "**AIG Funding Revolving Credit Agreement**").  It was standard procedure for AIG Inc. to use AIG Funding as the vehicle to make intercompany loans to AIG Inc.'s subsidiaries.

18.    Concurrently therewith, consistent with AIG Inc.'s standard procedures for intercompany loans, AIG Funding entered into a separate Revolving Credit Agreement with AIG

---

4    *See* Financial Crisis Inquiry Commission, The Financial Crisis Inquiry Report: Final Report of the National Commission on the Cause of the Financial and Economic Crisis in the United States (2011), https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf, p. 349.

5    At the same time, AIG Inc. entered into that certain Guarantee and Pledge Agreement, dated as of September 22, 2008 (the "**Guarantee and Pledge Agreement**"), among AIG Inc., the guarantors party thereto, and the Federal Reserve.  In exchange for the Fed Loan, the Federal Reserve was granted a lien on certain assets of AIG Inc. and a 79.9% ownership share in AIG Inc.  While the Fed Loan was initially secured by a pledge of capital stock and the assets of certain AIG Inc. subsidiaries only, on October 22, 2008, AIG FP entered into that certain Pledge Agreement Supplement with the Federal Reserve (the "**Pledge Agreement Supplement**"), which supplemented the Guarantee and Pledge Agreement to include AIG FP's assets and equity.  *See* Pledge Agreement Supplement, § 2.

FP (the "**AIG FP Revolving Credit Agreement**" and the loan extended thereunder, the "**AIG FP Revolver**") whereby it extended a $65 billion revolving credit line to AIG FP to use for "its direct and legitimate business needs." *See* AIG FP Revolving Credit Agreement § 3.3. A copy of the AIG FP Revolving Credit Agreement is attached hereto as Exhibit A.

19. AIG FP borrowed from AIG Inc. (via AIG Funding), which itself borrowed from the Federal Reserve, and used the proceeds of those borrowings to satisfy its Parent-guaranteed obligations, avoid a default, and thus avoid the collapse of AIG Inc. and broader financial contagion. In connection with the receipt of the Fed Loan and entry into the AIG FP Revolving Credit Agreement, AIG FP, in order to stabilize its financial positions and eliminate the ongoing collateral calls, removed certain troubled assets from its books in a series of transactions referred to as "Maiden Lane III." Through Maiden Lane III, the Federal Reserve purchased the collateralized debt obligations underlying AIG FP's mortgage-backed CDSs from AIG FP's counterparties at depressed market values. The counterparties agreed to cancel their related CDS contracts and retained over $35 billion in previously posted collateral. The net effect of the transactions allowed the counterparties to recover par value. The Maiden Lane III transactions terminated and removed those CDSs from AIG FP's books, but crystallized AIG FP's unrealized losses on those assets. As a result, AIG FP realized losses of approximately $25.8 billion in November 2008 and $7.5 billion in December 2008.

20. As of the Petition Date, AIG FP had drawn over $92 billion under the AIG FP Revolver to satisfy its obligations, and repaid over $59 billion,[6] leaving a balance of approximately $37.4 billion outstanding under the AIG FP Revolver.

---

[6] Excluding the capitalized interest paid since June 2011 in the approximate amount of $4.2 billion, as discussed in more detail in paragraph 35, below.

21.    Notwithstanding the outstanding balance on the AIG FP Revolver, by 2013, AIG Inc. fully repaid the Fed Loan.

### 3.    *After the Financial Crisis: Wind Down of Business and Portfolio*

22.    Following its receipt of the loan in October 2008, AIG FP began winding down its operations.    Due in part to the long-dated nature of the transactions on AIG FP's books, a wind down was a complex process that would take years to complete.    AIG FP needed to find replacement counterparties for various complex derivatives, a process that was complicated by the continued market downturn, a global recession, and decreased risk appetites.

23.    The $65 billion AIG FP Revolver enabled AIG FP to close out its most problematic open positions that carried the largest potential for additional sustained losses to AIG FP and, in turn, AIG Inc.  But AIG FP never recouped its losses from the Financial Crisis.  AIG FP delayed the initiation of any reorganization or liquidation proceedings to avoid triggering defaults on its derivatives and other financial positions that would result in additional significant losses to AIG FP.

### B.    **AIG FP's Business**

### 1.    *Balance Sheet*

24.    As of the Petition Date, AIG FP has assets totaling $315 million in book value, comprised of $216 million of intra- and intercompany receivables and investments in subsidiaries and the remaining $99 million consists primarily of a credit linked note and $10 million in cash on hand.  It has liabilities of $37.7 billion in book value, comprised primarily of the AIG FP Revolver in the amount of $37.4 billion and $269 million of intra- and intercompany payables.  Thus, AIG FP is balance sheet insolvent by approximately $37.4 billion.

29958241.1
US-DOCS\135839829

### 2. *AIG FP Subsidiaries*

25.     As of the Petition Date, AIG FP has ten wholly-owned subsidiaries in various states of wind down as well.  None of AIG FP's subsidiaries are debtors in this Chapter 11 Case.  A chart illustrating AIG FP's current organizational structure is attached hereto as Exhibit B.  Each of AIG FP's subsidiaries historically served a specific purpose in connection with AIG FP's complex derivatives and other structured products business, such as issuing debt securities and guaranteed investment contracts ("**GICs**")[7] or participating in long-dated structured leasing transactions.

### 3. *Shared Services Agreements*

26.     AIG FP is party to certain formal and informal shared services arrangements with AIG Inc. and other non-Debtor affiliates (together, the "**Non-Debtor Affiliates**").

27.     Pursuant to these arrangements, AIG FP receives certain employee and other corporate and administrative services from its affiliates (the "**Shared Services**" and the intercompany arrangements related thereto, the "**Shared Services Arrangements**").  Prior to the Petition Date, it was AIG FP's practice to receive the Shared Services in exchange for reasonable compensation and/or reimbursement in the ordinary course of business and all amounts AIG FP paid for Shared Services were settled in cash, set off, or recorded on AIG FP's books as intercompany payables in the ordinary course of business.  During the Chapter 11 Case, however, the Debtor will not make any disbursements to Non-Debtor Affiliates without Court approval.[8]  As

---

[7]   A guaranteed investment contract (known as a GIC) is an agreement between a financing entity and an investor whereby the insurance company guarantees a specified rate of return for the investor in exchange for holding a deposit for a specified fixed period.

[8]   As discussed in more detail in the *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor's Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing the Debtor's Continuation of Existing Deposit Practices, and (III) Granting Related Relief* (the "**Cash Management Motion**") filed concurrently herewith, the Debtor understands that the Non-Debtor Affiliates will not demand payment for Shared Services or other costs during the contemplated timeline of this Chapter 11 Case and, instead, will accrue administrative expense claims against the Debtor on account thereof, *provided, however,* that the Non-Debtor Affiliates have further agreed that all such administrative expense claims held by such Non-Debtor Affiliates shall be paid only *after* all accrued and

29958241.1
US-DOCS\135839829

of the Petition Date, no amounts are outstanding on account of prepetition Shared Services received by AIG FP.

28. The Shared Services, which allow AIG FP to access critical resources, information and expertise that cannot be replicated, can be grouped broadly into two categories: (i) employees and (ii) transaction, advisory, and administrative services.

**(i) <u>Shared Employees</u>**

29. As a result of the decrease in the Debtor's operations following the Financial Crisis, the Debtor only required a limited staff to continue its wind down, as further discussed in Part I of this First Day Declaration. As of the Petition Date, the Debtor does not directly employ any individuals. Instead, pursuant to various Shared Services Arrangements, certain of the Debtor's Non-Debtor Affiliates lend certain of their employees to the Debtor to oversee, manage, and assist with the Debtor's remaining operations and wind down (the "**<u>Shared Employees</u>**").[9] The Shared Employees are legally employed by various Non-Debtor Affiliates and only devote a portion of their time to performing work for AIG FP. Prior to the Petition Date, it was AIG FP's practice to remit payment to the applicable Non-Debtor Affiliate employing the Shared Employee for the percentage of that Shared Employee's compensation costs attributable to work performed for AIG FP. Following the Petition Date, however, the Non-Debtor Affiliates have agreed not to demand payment from the Debtor for its allocated share of the Shared Employees' costs during this Chapter

---

outstanding allowed fees of the Debtor's professionals have been paid in full in cash. The Debtor, Parent, and the other Non-Debtor Affiliates will each track all such disbursements electronically in their respective accounting systems so that they can each trace, account for, and ascertain the aggregate amount of the transactions and related claims as needed.

[9] While referred to as "Employees" in this First Day Declaration, as a technical matter, the "Employees" performing work for AIG FP are made up of individuals appointed as (1) Officers and (2) Authorized Traders of the Debtor. While the Officers generally manage high level strategy and make business decisions, the Authorized Traders' responsibilities are narrower and generally relate to the execution of trades or other financial positions as directed and determined by the Officers and the Board of the Debtor.

29958241.1
US-DOCS\135839829

11 Case and, instead, have agreed to accrue administrative expense claims against the Debtor, to be paid under the Debtor's Plan.

### (ii) **Transaction, Advisory, and Administrative Services**

30.     In addition to providing the Debtor with Shared Employees, there are also various Shared Services Arrangements in place relating to the Debtor's receipt of certain services from Non-Debtor Affiliates.  At a high level, the Non-Debtor Affiliates generally provide transaction and advisory services to the Debtor.

31.     As discussed in Part I.A above, the Debtor still maintains a limited portfolio of derivatives and other transactions that it continues to wind down and hedge in connection with the orderly unwinding of its business.  To assist with this process and ensure that such transactions are wound down in the most efficient and value-maximizing manner, in addition to the day-to-day management of the Debtor's remaining business, the Non-Debtor Affiliates provide certain services to the Debtor, including: cash management, derivatives transaction, legal, compliance, administrative, operations, risk management, strategic advisory, investment management, and other related services.  Prior to the Petition Date, all amounts owing on account of the transaction and advisory Shared Services, pursuant to the respective Shared Services Arrangements, were remitted by the Debtor to the applicable Non-Debtor Affiliate.  As previously explained, however, following the Petition Date, the Non-Debtor Affiliates have agreed not to demand payment from the Debtor for these Shared Services during this Chapter 11 Case and, instead, have agreed to accrue administrative expense claims against the Debtor, to be paid under the Debtor's Plan.

### 4.     *Tax Sharing Agreement*

32.     Due to the fact that AIG FP is part of a consolidated group for which AIG Inc. is the parent for U.S. Federal Income Tax purposes, AIG FP is also party to that certain Amended

29958241.1
US-DOCS\135839829

and Restated Tax Sharing Agreement, dated September 11, 2013 (the "**TSA**"), between AIG FP and AIG Inc.

33.     For each applicable taxable year, AIG FP files a U.S. consolidated federal income tax return with AIG Inc., as parent.  For each taxable year for which the consolidated return is filed, AIG FP pays to AIG Inc. an amount computed under a formula intended to approximate the hypothetical U.S. federal income tax liability that AIG FP would owe for that taxable year if it filed a separate return, taking into account certain post-2011 tax attributes of AIG FP (such as net operating losses, capital losses, tax credits and any similar items).

34.     The TSA also provides for apportionment of each quarterly estimated tax payment due with respect to the consolidated return between AIG Inc. and AIG FP and requires that AIG FP pay AIG Inc. (i) AIG FP's allocable portion within 30 days after AIG Inc. makes the applicable quarterly estimated tax payment and (ii) the excess, if any, of the final allocable tax liability of AIG FP for the entire taxable year over the quarterly payments previously made by AIG FP within 30 days after the date on which the consolidated tax return is filed.  To the extent AIG FP does not have sufficient funds, the payments due to AIG Inc. are paid through an intercompany loan (usually through increasing the balance of the AIG FP Revolver).  Any adjustment made by the Internal Revenue Service to the consolidated tax return is apportioned to AIG FP, as applicable, and the payments are recomputed accordingly.

## II.    PREPETITION CAPITAL STRUCTURE

### A.    Parent Revolver

35.     As detailed in Part I.B above, the AIG FP Revolving Credit Agreement provided for borrowings of up to $65 billion in aggregate principal amount at any one time.  The AIG FP Revolving Credit Agreement was ultimately assumed by AIG Inc. in connection with its merger with AIG Funding, pursuant to which AIG Inc. assumed all of AIG Funding's liabilities.  The

parties entered into an amendment in June 2011, permitting interest capitalization on the AIG FP Revolver.  From its initial funding until June 2011, AIG FP paid interest totaling approximately $6 billion.  The total amount of capitalized interest since June 2011 is approximately $4.2 billion. In total, AIG FP borrowed over $92 billion under the AIG FP Revolver and repaid over $59 billion. As of the Petition Date, there is approximately $37.4 billion borrowed and outstanding under the AIG FP Revolver.

### B.    Intercompany Assets & Liabilities

36.    A significant portion of AIG FP's assets and liabilities are comprised of inter- and intracompany payables and receivables.  As of the Petition Date, AIG FP owed approximately $269 million and was owed approximately $42 million on account of intercompany payables and receivables, respectively.  These intercompany payables and receivables are in addition to the balance of the AIG FP Revolver.

### C.    Derivatives

37.    In connection with its continued wind down of its derivatives business, AIG FP sought its counterparties' cooperation in closing out various derivatives positions over the past 14 years. At its peak, the notional amount of AIG FP's derivatives reached approximately $2.1 trillion by the end of 2007.  Most recently, AIG FP continued its wind down efforts by novating its few remaining third-party derivatives positions to Markets, a non-subsidiary affiliate of AIG FP (the "**Markets-Novated Trades**") and AIG Matched Funding Corp. ("**Matched**"), a direct wholly-owned subsidiary of AIG FP (the "**Matched-Novated Trades**").  The economic risk of the Markets-Novated Trades was passed to Matched through corresponding back-to-back, or "mirror," trades, resulting in the ultimate economics of those Markets-Novated Trades sitting on Matched's books.  The novations of the Markets-Novated Trades and the Matched-Novated Trades resulted in no net impact on the AIG FP balance sheet.  Net asset and equity balances remained

14

the same.  The novations were done to prevent the postpetition safe-harbored termination of live trades, and the resulting material loss of asset value and material increases in liabilities and expenses.  As a result of these efforts, as of the Petition Date, no third-party derivative positions remain at AIG FP.

        **D.**      **Other Structured Products**

      38.     In addition to the derivatives transactions described above, AIG FP, with the support of specific parent guarantees from AIG Inc., has issued standby letters of credit and entered into "credit default option agreements" (functionally similar to a letter of credit) in the context of certain structured lease transactions.  The current maximum exposure of AIG FP under these credit support arrangements is around $127 million.  In such transactions, AIG FP has agreed (in exchange for an upfront fee) to make certain lease termination payments if not made in full by the relevant leasing party.  Following any payment by AIG FP, such leasing party (*e.g.*, a local transit authority) is obligated to reimburse AIG FP.  These structured products were written prior to the Financial Crisis and a number of them have been terminated over the years (including due to the downgrade of AIG Inc.'s credit ratings).  In connection with its continued wind down of its structured finance business, AIG FP is in the process of finalizing the legal documentation for the transfer of these positions to Matched (with the continued support of related AIG Inc. parent guarantees).

      39.     In addition, AIG FP, with the support of specific parent guarantees from AIG Inc., is party to certain debt service account liquidity agreements related to two U.S. military housing projects.  The current maximum exposure of AIG FP under these facilities is around $32.7 million.  In those transactions, the borrower issues debt in the form of rated bonds, the terms of which require the borrower to fund a debt service reserve account.  In lieu of the borrower funding such account with cash, AIG FP has provided a "liquidity facility".  Pursuant to such facility, AIG FP

has (in exchange for an upfront premium payment) agreed to make payments in the event there is a deficiency in the debt service reserve account to pay regularly scheduled payments under the bonds.  Following any payment by AIG FP, the relevant borrower would have a reimbursement obligation to AIG FP.  In connection with its continued wind down of its structured finance business, AIG FP is in the process of finalizing the legal documentation for the transfer of these facilities to Matched (with the continued support of related AIG Inc. parent guarantees).

40.      Finally, AIG FP and another non-Debtor subsidiary of AIG FP, AIG Management France Limited (*f/k/a* AIG Management France SA (*f/k/a* Banque AIG)), are parties to a structured transaction involving a third-party special-purpose Cayman entity, Gibraltar Holdings Limited ("**GHL**").  GHL issued credit linked notes ("**CLNs**") that are held by AIG FP.  AIG FP is entitled to periodic payments of interest and principal on the CLNs through maturity in 2026.  This structured finance position remains on AIG FP's books as an asset.

## III.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

### A.    Wind Down of AIG FP

41.      In October 2008, AIG FP began winding down its portfolio.  Notwithstanding its losses and liabilities, AIG FP still had valuable assets in its portfolio, including in the form of derivatives transactions that individually could continue to generate value for many years.  As such, AIG FP used the AIG FP Revolver to maximize value and minimize losses by completing its wind down gradually over time.

42.      AIG FP has not recouped the losses it suffered as a result of the Financial Crisis and has only survived by accessing the AIG FP Revolver, which it will not be able to repay in full. Furthermore, under the terms of the AIG FP Revolving Credit Agreement, AIG Inc. has no obligation to provide any additional funding to AIG FP on a current or ongoing basis.

B.     **Certain Litigation Against AIG FP**

(i)     **Overview of Deferred Compensation Plans**

43.     Given AIG FP was initially characterized as a "joint venture," profits earned by AIG FP were historically split on a 70/30 basis, with 70% going to AIG Inc. and the remaining 30% going to AIG FP executives.  To align incentives for long-term growth over short-term profits, a portion of these profits was not paid out immediately to AIG Inc. or the executives, but rather was deferred, to be paid in the future, subject to various adjustments and conditions.   This arrangement was reflected in the AIG FP Deferred Compensation Plan, dated December 1, 1995 (as amended and modified, the "**DCP**").[10]   The DCP established AIG Inc. and the executives of AIG FP as "**Plan Participants**" (participating AIG FP employees are referred to hereafter as the "**FP Plan Participants**").[11]   A copy of the DCP is attached hereto as Exhibit C.

44.     The DCP's goals were straightforward: (i) to promote the formation of capital in AIG FP; (ii) to provide for the Plan Participants to share in the risks and rewards of AIG FP; (iii) to promote the Plan Participants' commitment to the long-term integrity of AIG FP; (iv) to align the interests between the AIG FP executives and AIG Inc.; and (v) to serve as an investment opportunity to attract the most talented people to AIG FP and to retain those already at AIG FP.[12]

45.     Under the DCP, at the end of each year, "Distributable Income" (defined as AIG FP's revenues, less expenses and credit and market reserves taken for that year, as determined by the Board from time to time),[13] would be calculated and a portion of the Distributable Income,

---

[10]   Although initially adopted on December 1, 1995, the DCP has been subsequently amended, with the last amendment occurring on December 22, 2010.

[11]   Prior to AIG FP's entry into the Shared Services Arrangements, discussed more fully in paragraphs 26–31 above, AIG FP employed members of its workforce directly.

[12]   *See* DCP Preamble.

[13]   *See* DCP §1.08.

apportioned 70% from AIG and 30% from FP Plan Participants, was credited to both AIG Inc. and to the FP Plan Participants' Deferred Compensation Accounts (the "**Plan Accounts**").  Absent losses, as discussed below, such Plan Account balances were to be paid to AIG Inc. and the FP Plan Participants annually in arrears beginning in October of each year in equal pro rata installments corresponding to the approximate average life of AIG FP's swap transaction portfolio, on a schedule determined by the board of AIG FP.[14]

46.    In the event AIG FP suffered losses[15] in a given year, the DCP provided for AIG FP to reduce the outstanding balance credited to the Plan Account of each Plan Participant (the "**Reduction Provision**").  The DCP also included a mechanism for AIG FP to subsequently restore the reduced Plan Account balances (the "**Restoration Provision**"),[16] which became a focus of the litigation, as more fully explained in paragraphs 55–60 below.[17]

47.    The DCP explicitly provides that benefits under the DCP "shall *not* have the benefit of any guarantee by AIG [Inc.]"[18]  The DCP also makes clear that, in the event AIG FP files for bankruptcy, "the obligations under [the] Deferred Compensation Plan to Participants and their Beneficiaries [. . .] shall be *subordinate and junior* in right of payment and otherwise, to the prior payment in full of all the other obligations of AIG [FP]."

48.    As such, even if AIG FP were obligated to restore the Plan Account balances (which it is not), any claim by an FP Plan Participant would be subordinated below "all" other AIG FP obligations in this bankruptcy.

---

14    *See* DCP §3.05(b).

15    Under the DCP, and for the purposes of reducing plan balances, losses are those losses that "in the aggregate exceed the outstanding market and credit reserves and current year income of AIG FP."

16    *See id.*

17    *See id.*

18    *See* DCP § 4.01(a) (emphasis in original).

29958241.1
US-DOCS\135839829

49.     In response to unrealized losses from AIG FP's credit derivative business in 2007, AIG FP capped the payments on account of deferred compensation awarded pursuant to the DCP, and introduced the Special Incentive Plan (the "**SIP**").  The SIP mitigated the shortfall created by the cap on DCP payments by crediting to new "SIP" accounts, sums equivalent to the difference between the amounts that would have been awarded under the DCP absent the cap on DCP payments and the amount of such payments on account of deferred compensation actually awarded under the DCP.  The amounts credited to the SIP accounts were to be paid at a future time, with the SIP expressly stating that its purposes included building capital to ensure "that amounts are available to absorb losses in the event that AIG FP realizes losses on super senior credit derivatives that would have an impact on AIG FP's capital structure."

50.     The SIP contained materially similar Reduction and Restoration Provisions as those contained in the DCP, so that if any losses were incurred in excess of reserves and current year income, SIP credits would be reduced. The SIP also included materially identical language providing that AIG Inc. did not guarantee any obligation under the plan, and expressly subordinating any claim under the SIP in bankruptcy.

51.     By early 2008, because both the broader market and AIG Inc. and its subsidiaries were coming under increased pressure, AIG FP introduced the Employee Retention Plan (the "**ERP**"), effective from December 1, 2007, which provided for guaranteed retention awards. Unlike the payments on account of deferred compensation under the DCP and SIP, these awards were determined without regard to AIG FP's 2008 or 2009 financial performance.  The ERP further provided for a portion of those awards to be paid no later than March 15 of the calendar year following the relevant compensation year, with payment guaranteed by AIG Inc.  Pursuant to the ERP, the remainder of the ERP awards were deferred into the Plan Accounts, where they would

be subject to the Reduction and Restoration Provisions of the DCP and would not be subject to any parent guaranty.

52.     As noted above, AIG FP suffered massive losses in 2008, threatening to infect the global financial system.  Once such losses were applied to the Plan Accounts, balances were wiped out.  The DCP and SIP provided, in relevant part, that "to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse."  AIG FP never recouped the enormous losses it suffered as a result of the Financial Crisis and, as such, did not restore the Plan Account balances under the DCP or SIP.  In July 2014, AIG FP sent a letter informing FP Plan Participants that "no restorations have been possible given the magnitude of losses sustained by AIG FP" and that AIG FP's "restoration obligation lapsed as of December 31, 2013."[19]

### (ii)    AIG FP Prevails in Litigation in the United Kingdom

53.     On October 8, 2014, a group of London-based FP Plan Participants sued AIG FP in an English trial court seeking payments on account of deferred compensation allegedly owed to them under the DCP and the SIP (together, the "**Compensation Plans**").  Specifically, the English plaintiffs asserted that AIG FP failed to restore the account balances or adopt any plan to do so by December 2013, in breach of their obligations under the Compensation Plans.  The English plaintiffs also brought a separate tort claim against AIG Inc.

54.     After a bench trial, on November 9, 2018, the trial court dismissed the tort claim against AIG Inc., but found that AIG FP had an "unqualified" obligation to restore the account balances and breached the Compensation Plans when they failed to do so.  AIG FP appealed.

55.     On January 24, 2020, a three-judge panel of the English Court of Appeal unanimously reversed the trial court decision, holding as a matter of Connecticut law that AIG FP

---

[19]    *See* Complaint in the case captioned *Arthurs v. AIG Fin. Prod. Corp.*, Case No. X08-FST-CV-19-6046057-S (Conn. Super. Ct. Dec. 6, 2019), Ex. D.

had not breached the Compensation Plans and determining that AIG FP had promised to restore the account balances only if it "has Distributable Income and is in profit again."  Because AIG FP never recouped its losses from the Financial Crisis, the restoration obligation was never triggered before it lapsed on December 31, 2013.  The English Court of Appeal further found that a contrary reading would be impermissibly circular, because an obligation to restore account balances would simply create a new debt and further losses that, absent profits, would lead to further deductions.  On August 6, 2020, the UK Supreme Court denied leave to appeal, making the English Court of Appeal's decision the final decision.

### (iii)    Ongoing Litigation in Connecticut

56.    On December 6, 2019, after the English trial court found in favor of the FP Plan Participants, and shortly before the English Court of Appeal ruled in favor of AIG FP, 46 U.S.-based Plan Participants (the "**CT Plaintiffs**") filed a complaint against AIG FP in the Connecticut Superior Court (the "**CT Litigation**").

57.    The CT Plaintiffs brought claims all premised on the same breach-of-contract theory that was presented, and rejected, in the English litigation, namely, that AIG FP was contractually obligated to restore the account balances notwithstanding its continued losses.  Plaintiffs also asserted a wage-and-hour claim that could potentially double damages against AIG FP.

58.    On September 24, 2020, AIG FP filed a motion to strike the CT Plaintiffs' complaint.  On May 24, 2021, the Connecticut Superior Court denied that motion.  Summary judgment motions have not yet been filed, and a trial (if any) was not scheduled to start before July 2023.  AIG FP does not have the cash to satisfy an adverse judgment and is balance sheet insolvent without taking into account any potential liability to the CT Plaintiffs.  The cost of defending the UK Litigation and the CT Litigation has been significant.  Continued litigation through discovery,

motion practice, trial, appeals, and any remands would materially decrease the value of AIG FP's estate.

### C.    Appointment of Special Committee and Related Matters

#### (i)    Formation of Special Committee

59.    On January 21, 2022, Pamela Corrie and John S. Dubel were appointed as independent directors to the Board of Directors of AIG FP (the "**Board**").  On January 24, 2022, the Board approved the formation of a special committee of the Board (the "**Special Committee**"), consisting of Ms. Corrie and Mr. Dubel.  The Special Committee was given the authority to, among other things, assess AIG FP's ongoing activities and assets and liabilities, evaluate and oversee potential strategic transactions, assess potential claims by or against AIG FP (including conducting an internal legal analysis into certain transactions and the viability of such claims by or against AIG FP), and take any actions in connection therewith.

60.    In connection therewith, on January 24, 2022, the Special Committee approved the retention of A&M as financial advisor and I was appointed as CRO.[20]  Separately, on January 24, 2022, the Special Committee also approved the retention of Latham & Watkins LLP ("**Latham**") to serve as counsel to assist the Special Committee with its evaluation of potential strategic transactions, related activities, and potential claims.[21]  Following its formation and the retention of AIG FP's advisors, the Special Committee held weekly meetings with myself, Latham, and other A&M professionals.

---

[20]    For further information regarding AIG FP's retention of A&M, see the A&M Retention Application to be filed with the Court.

[21]    For further information regarding AIG FP's retention of Latham, see the Latham Retention Application to be filed with the Court.

      **(ii)**     **Revolver Analysis**

61.     Given that AIG Inc. is both the sole equity owner of AIG FP and its largest creditor pursuant to the AIG FP Revolving Credit Agreement, the Special Committee has reviewed and analyzed the terms and conditions of the AIG FP Revolver to assess AIG Inc.'s claim against AIG FP as of the Petition Date (the "**Revolver Analysis**"). The Board of AIG FP delegated authority to the Special Committee to oversee the Revolver Analysis with the assistance of Latham. The Special Committee has concluded that AIG Inc.'s claim is valid and allowable against AIG FP and senior to any claims under the DCP and SIP, which are expressly subordinated to such claims of AIG Inc.

62.     Latham attorneys have worked over one thousand hours on this Revolver Analysis and other analyses. Their work has encompassed extensive legal research and analysis as well as factual research, including reviewing several hundred thousand documents and interviewing current and former employees of AIG Inc. and AIG FP with knowledge of the AIG FP Revolver. Latham has met with and discussed its analysis with the Special Committee on dozens of occasions. The Special Committee, with Latham's assistance, has concluded that the AIG FP Revolver was and is debt given the law and the facts.

**D.**     **The Contemplated Plan and Debtor's Goals in the Chapter 11 Case**

63.     As of the Petition Date, AIG Inc. is the Holder of (a) the Prepetition Revolving Loan Claim in the amount of approximately $37.4 billion and (b) 100% of the Existing AIG FP Interests. The *Plan of Reorganization of AIG Financial Products Corp. Under Chapter 11 of the Bankruptcy Code* (the "**Plan**"), filed concurrently herewith, provides for the full satisfaction, settlement, discharge, and release of the Parent's Prepetition Revolving Loan Claim in exchange for the Parent's retention of its Existing AIG FP Interests. Under the Plan, the Parent will not

retain any Existing AIG FP Interests or receive any other distribution on account of its Allowed Existing AIG FP Interests.

64.    As of the date hereof, the Prepetition Revolving Loan Claim is an unsecured Claim against the Debtor and, therefore, ranks *pari passu* with the General Unsecured Claims and Intercompany Claims against the Debtor.  The Prepetition Revolving Loan Claim is, however, senior to the Subordinated Claims[22] held by the CT Plaintiffs (referred to in the Plan as the "**DCP Plaintiffs**") against the Debtor because such Subordinated Claims are expressly subordinated and junior to all other obligations of the Debtor under the terms of the DCP Plans.

65.    With respect to the Subordinated Claims, the Plan provides for a compromise and settlement of the claims held by the DCP Claimants (the "**Global Settlement**").  Pursuant to the Global Settlement, solely in the event that Class 7 (Subordinated Claims) votes to accept the Plan, the Parent has agreed to permit each DCP Claimant to receive, in full satisfaction, settlement, discharge, and release of, and in exchange for, its Allowed Class 7 Subordinated Claim, an equal share of the Class 7 Cash Pool, based on the number of Holders in Class 7, which equals $1,000,000.00 in the aggregate.  Furthermore, the Parent has consented to the funding of the Class 7 Cash Pool with cash, the value of which the Parent would otherwise be entitled to receive as part of its recovery on account of its Class 4 Prepetition Revolving Loan Claims.  In the event Class 7 (Subordinated Claims) votes to reject the Plan, to the extent Confirmation and Consummation of the Plan occurs, each DCP Claimant shall not receive any distribution nor retain any property on account of its Class 7 Claims and, on the Effective Date, the Class 7 Claims will be discharged.

---

[22]   For the avoidance of doubt, the Debtor's description or classification in this Declaration, the Plan, or the Disclosure Statement of any obligations arising under or related to the DCP Plans as Claims is not an admission that such obligations are debt, and the Debtor reserves the right to object to the allowance of such Claims and to classify any such obligations as Equity Interests.

66.     As set forth in the *Disclosure Statement for the Plan of Reorganization for AIG Financial Products Corp. Under Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**"), filed concurrently herewith, in parallel with its requested approval of the Disclosure Statement and subsequent solicitation of votes on the Plan, the Debtor intends to conduct a marketing process for the sale of all or substantially all of the Debtor's assets under section 363 of the Bankruptcy Code (the "**363 Sale**").  In the event that the Debtor does not receive the requisite votes to confirm the Plan or otherwise fails to meet the requirements for confirmation under section 1129 of the Bankruptcy Code, the Debtor intends to pursue and consummate a 363 Sale and the Debtor reserves all rights to seek such sale.  In furtherance of the foregoing, the Debtor intends to file one or more motions with this Court requesting approval of (a) bidding and auction procedures in connection with the proposed 363 Sale, and (b) the consummation of the 363 Sale.

67.     Ultimately, the immediate focus of this Chapter 11 Case is to achieve an orderly, efficient, and value-maximizing reorganization of AIG FP's balance sheet, which will benefit the Debtor's estate and provide the most robust recoveries possible to creditors during the ensuing wind down.

## IV.     FIRST DAY PLEADINGS

68.     Contemporaneously herewith, the Debtor has filed with the Court First Day Pleadings seeking orders granting various forms of relief intended to facilitate the efficient administration of this Chapter 11 Case.  The First Day Pleadings include the following:

- *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor's Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing the Debtor's Deposit Practices, and (III) Granting Related Relief*

- *Application of Debtor for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtor, Effective as of the Petition Date, and (II) Granting Related Relief*

69.    The First Day Pleadings seek, among other things, authority to use the Debtor's cash management system during the Chapter 11 Case and approval of the retention of Epiq Corporate Restructuring, LLC as claims and noticing agent.

70.    I am familiar with the content and substance of each of the First Day Pleadings. I believe approval of the relief sought in each of the First Day Pleadings is critical to the Debtor's ability to implement its chapter 11 strategy in an efficient manner and to preserve and maximize the value of its estate for the benefit of all its stakeholders.

*[Remainder of page intentionally left blank]*

29958241.1
US-DOCS\135839829

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of December 2022.

/s/ *William C. Kosturos*
William C. Kosturos
Chief Restructuring Officer of AIG Financial Products Corp.

**<u>Exhibit A</u>**

**AIG FP Revolving Credit Agreement**

## REVOLVING CREDIT AGREEMENT

REVOLVING CREDIT AGREEMENT ("Agreement") dated as of this 22nd day of September, 2008, by and between AIG Funding, Inc. a Delaware corporation, with its principal executive offices located at 70 Pine Street, New York, NY 10270 ("AIG Funding") and AIG Financial Products Corp. a Delaware corporation with its principal executive offices located at 50 Danbury Road, Wilton, CT 06897 ("Borrower").

WHEREAS, the Borrower has requested of AIG Funding a Sixty-Five Billion Dollars ($65,000,000,000.00) revolving loan facility, and AIG Funding is willing to grant that request, subject to the terms and conditions hereof;

NOW, THEREFORE, in consideration of the mutual promises and covenants made herein, and other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1. SECTION 1. THE LOANS

### 1.1   The Borrowings

Subject to the terms and conditions of this Agreement, AIG Funding agrees, in its sole discretion, upon the receipt of an authorized written request from the Borrower, to lend Borrower from time to time from the date of this Agreement up to but not including the Termination Date (as hereinafter defined) amounts not exceeding Sixty-Five Billion Dollars ($65,000,000,000) in aggregate principal amount at any one time.

### 1.2   Interest

Interest shall be paid upon the unpaid principal amount of all loans made pursuant to this Agreement for the period from the date of the borrowing of such principal through but excluding the date upon which such principal is fully paid at a mutually agreed rate per annum which the parties may determine, from time to time (but in no event shall such rate be higher than the maximum rate permitted by law).  Interest shall be calculated on the aggregate unpaid principal amount on the basis of the actual days elapsed in a year of three hundred sixty (360) days. Interest shall be payable monthly in arrears by the fifteenth (15th) day of each month (the "Interest Payment Dates") until such time as the aggregate unpaid principal amount is paid in full.  Interest shall be compounded on the first day of each month.  If any payment becomes due and payable on a Saturday, Sunday or a legal or bank holiday in the State of New York (any day, other than such days a "Business Day"), such payment shall be due and payable on the immediately preceding Business Day, subject to the terms of this Section 1.2.

1.3    <u>The Note</u>

All borrowings made by Borrower pursuant to Section 1.1 hereof shall be evidenced by the Borrower's execution and delivery of a single promissory note in the form of <u>Exhibit A</u> attached hereto ("Note"), dated the date of the making of the initial loan, payable to the order of AIG Funding in the aggregate principal amount of Sixty-Five Billion Dollars ($65,000,000,000) or, if less, the aggregate unpaid principal amount of all loans made by AIG Funding to the Borrower pursuant to this Agreement.  AIG Funding shall note upon a schedule attached as <u>Schedule 1</u> to the Note, all borrowings made by Borrower pursuant to Section 1.1 hereof and all repayments of principal made by Borrower pursuant to Section 1.4 hereof.  Such notations shall, in the absence of manifest error, be conclusive as to the aggregate unpaid principal amount of all loans made by AIG Funding pursuant to Section 1.1 hereof, provided, however, that the failure to make such notation with respect to any loan or repayment shall not limit or otherwise affect the obligations of the Borrower under this Agreement or the Note.  Borrower may from time to time request that AIG Funding provide Borrower with a copy of the Schedule so that Borrower may confirm the aggregate unpaid principal balance referenced in the Note.

1.4    <u>Voluntary Repayments</u>

Borrower shall have the right to repay the principal amount of the loans made by AIG Funding hereunder, in whole at any time or in part from time to time, without premium or penalty.  If the Borrower repays in whole, then such repayment shall be accompanied by all accrued interest owed to the date of repayment.

1.5    <u>Manner of Payment</u>

All payments to be made by the Borrower on account of borrowings hereunder shall be made without set-off or counterclaim in lawful currency of the United States of America prior to 12:00 Noon, New York City time, on the date when due, in immediately available funds.

1.6    <u>Termination</u>

    a) This Agreement shall have a term of twenty-four (24) months and shall automatically renew on the anniversary hereof for a twelve (12) month term on such anniversary and any subsequent annual anniversary (each, an "Anniversary Date") unless the Agreement is terminated by a written instrument signed by each of the parties hereto.  In the event that an Anniversary Date shall fall on a day that is not a Business Day, then such Anniversary Date shall be deemed to be the immediately succeeding Business Day.

    b) Notwithstanding paragraph a) above, this Agreement (x) may be terminated at any time by the Borrower upon thirty (30) days' prior written

notice to AIG Funding, (y) may be terminated immediately by AIG Funding upon any breach by the Borrower of any material obligation set forth in this Agreement, and (z) shall automatically and without further action by the Borrower or AIG Funding terminate in the event of any insolvency or bankruptcy of the Borrower, provided in each of the foregoing cases that, upon such termination, all outstanding indebtedness under this Agreement shall automatically and without further action by AIG Funding or the Borrower become immediately due and payable, and shall be paid by the Borrower to AIG Funding.

Termination of this Agreement shall result in a termination of AIG Funding's obligation to make loans hereunder only, and shall not relieve the Borrower of any obligations hereunder.

c) The 'Termination Date' shall be the date on which this Agreement terminates, whether by a written instrument signed by the parties pursuant to Section 1.6(a) or by early termination pursuant to Section 1.6(b).

## SECTION 2.  CONDITIONS PRECEDENT TO BORROWINGS

### 2.1    Initial Borrowing

The obligation of AIG Funding to make any loan is conditional upon receipt by AIG Funding of (i) the Note in the form attached as Exhibit A hereto, duly executed by the Borrower and (ii) certified copies of Resolutions of Borrower's Board of Directors authorizing the execution and delivery by it of this Agreement and the Note and the incurrence and repayment of the obligations thereunder.

## SECTION 3.  COVENANTS

### 3.1    Right of Inspection

So long as any indebtedness under this Agreement remains unpaid, or for so long as the Borrower shall have the right to borrow hereunder, AIG Funding may inspect Borrower's properties and its books and records from time to time at any reasonable time and make copies of such books and records from time to time at any reasonable time.

### 3.2    Merger Transactions

The Borrower will not merge with or into or consolidate with any other person, sell, transfer or dispose of all or substantially all of its assets or undergo any change in the control of its voting stock, so long as any indebtedness owed under this Agreement remains unpaid, unless it receives the prior written authorization of AIG Funding.  For purposes of this agreement, person shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

### 3.3    Use of Proceeds

The Borrower shall use the proceeds of loans under this Agreement solely for the purpose of its direct and legitimate business needs.

### SECTION 4.  MISCELLANEOUS

4.1      Neither the failure nor any delay on the part of AIG Funding to exercise any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any further exercise of such right, power or privilege or any exercise of any other right, power or privilege.

4.2      The provisions of this Agreement shall not be modified, amended or waived save in writing, executed by all parties.  This Agreement, the obligations and rights hereunder and all supporting documents referred to herein shall be construed in accordance with the laws of the State of New York, without giving effect to any contrary result otherwise required under applicable principles of conflicts or choice of law.   In the case any one or more of the provisions contained in this agreement should be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

4.3      Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of Borrower and AIG Funding, their successors and assigns, except that the Borrower may not assign or otherwise transfer any of its obligations, rights or interests in or to this Agreement without the prior written consent of AIG Funding and its successors or assigns.

4.4      All notices required in writing under this Agreement shall be considered as having been given by one party to the other upon the latter party's receipt of same.  All such notices shall be transmitted by registered or certified mail or by facsimile.  Such written notice shall be sent to the attention of the Chief Financial Officer and General Counsel of each of the parties hereto.

4.5      This Agreement and any termination thereof pursuant to Section 1.6(a) may be executed in any number of counterparts, each of which counterpart when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same Agreement. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto.

[THE FOLLOWING PAGE IS THE SIGNATURE PAGE]

## **PROMISSORY NOTE**

EFFECTIVE DATE:  September 22, 2008

For valuable consideration, receipt of which is hereby acknowledged, AIG Financial Products Corp., a Delaware corporation ("Borrower"), hereby unconditionally promises to pay to the order of AIG Funding, Inc., a Delaware corporation ("AIG Funding") in legal currency of the United States of America and in immediately available funds, the principal sum of Sixty-Five Billion Dollars ($65,000,000,000) or, if less, the aggregate unpaid principal amount of all loans made by AIG Funding to the Borrower pursuant to the Revolving Credit Agreement dated as of September 22, 2008, between AIG Funding and Borrower (the "Revolving Credit Agreement").  Borrower further agrees to pay interest in like manner upon the unpaid principal amount hereof until such principal balance referenced in this Note has been paid in full at a mutually agreed rate per annum which the parties may determine, from time to time (but in no event shall such rate be higher than the maximum rate permitted by law).  Interest shall be payable monthly in arrears by the fifteenth (15th) day of each month (hereinafter referred to as the "Interest Payment Dates") until such time as the aggregate unpaid principal balance referenced in this Note is paid in full.  Daily interest shall be computed based upon the actual days elapsed in a year of three hundred sixty (360) days.  Interest shall be compounded on the first day of each month.  If any payment on this Note becomes due and payable on a Saturday, Sunday or legal or bank holiday in the State of New York, such payment shall be due and payable on the immediately preceding day which is not a Saturday, Sunday or legal or bank holiday in the State of New York ("Business Day").

Borrower may repay the principal amount of the loans made by AIG Funding under this Note, in whole at any time or in part from time to time, without premium or penalty.  If the Borrower repays in whole, then such repayment shall be accompanied by all accrued interest owed to the date of repayment.

Except as may be specifically provided herein, Borrower waives presentment for payment, demand, notice of nonpayment, notice of protest and protest of this Note, and agrees to pay, as soon as incurred, all costs and expenses, including reasonable counsel fees, incidental to the collection of this Note or in any way relating to the rights of holder hereunder.  The holder hereof may release, renew or extend any of the liabilities of Borrower and may make additional advances or extensions of credit to it or grant other indulgences or extend the time for any payment of principal or interest hereunder, all from time to time, without further notice to or assent from any other party or any endorser hereof.

The Borrower hereby authorizes AIG Funding to endorse on the Schedule annexed to this Note all loans made to the Borrower and all repayments of

principal amounts in respect of such loans, which endorsements shall, in the absence of manifest error, be conclusive as to the outstanding principal amount of all loans hereunder; provided, however, that the failure to make such notation with respect to any loan or repayment shall not limit or otherwise affect the obligations of the Borrower under the Revolving Credit Agreement or this Note.

Terms used herein which are defined in the Revolving Credit Agreement shall have their defined meanings when used herein.

This Note shall be governed by the laws of the State of New York, without giving effect to any contrary result otherwise required under applicable conflict or choice of law rules.

This Note is the Note referred to in the Revolving Credit Agreement and is qualified by, and subject to, all of the terms and conditions provided therein. In the event that any conflict, inconsistency or incongruity arises between the provisions of the Revolving Credit Agreement and the terms of this Note, the terms of the Revolving Credit Agreement shall in all respects control.

> AIG FINANCIAL PRODUCTS CORP.,
> as Borrower
>
> By: _____
> Name:
> Title:
> Date:

Schedule I

LOANS AND REPAYMENT OF PRINCIPAL UNDER
REVOLVING CREDIT AGREEMENT DATED AS OF SEPTEMBER 22, 2008
BETWEEN AIG FUNDING, INC. AND AIG FINANCIAL PRODUCTS CORP.

| DATE | AMOUNT OF LOAN | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE | NAME OF PERSON MAKING NOTATION |
|------|------|------|------|------|
|      |      |      |      |      |

## **Exhibit B**

## **AIG FP Organizational Structure**



Notes:
1. All ownership percentages are 100% unless otherwise noted.
2. AIG Management France Limited also has a registered branch in France.
3. One share of AIG Financial Products Hong Kong Limited is held in trust for AIG Financial Products Corp. by AIG-FP Capital Preservation Corp. AIG Financial Products Hong Kong Limited is also the general partner holding 1% ownership in The AIV Limited Partnership (in liquidation).

**Debtor**

**Non-Debtor Subsidiary**

US-DOCS\135839829

**<u>Exhibit C</u>**

**Deferred Compensation Plan**

Dated as of December 22, 2010

AIG FINANCIAL PRODUCTS CORP.
DEFERRED COMPENSATION PLAN

Conformed Copy Reflecting:

Amendment No. 1 dated as of December 5, 2003,
Amendment No. 2 dated as of November 17, 2004,
Amendment No. 3 dated as of March 18, 2005,
Amendment No. 4 dated as of December 29, 2008
Amendment No. 5 dated as of December 22, 2010

AIG FINANCIAL PRODUCTS CORP.
DEFERRED COMPENSATION PLAN

AIG Financial Products Corp. (including, where applicable, all subsidiaries thereof, and AIG Trading Group Inc. (including where applicable all subsidiaries thereof, "AIGTG") (together, "AIGFP")) establishes in this document the AIGFP Deferred Compensation Plan, as amended and restated as of the date hereof (the "Plan"). The Plan participants are the executive employees of AIGFP (the "AIGFP Executives") and American International Group, Inc. ("AIG"). The Plan provides the Plan participants a sharing of the risks and rewards of AIGFP's business and reflects the participants' commitment to the long term integrity of AIGFP.

The Plan objectives are:

1. To promote the formation of capital in AIGFP;

2. To ensure that the interests of AIGFP Executives and AIG are aligned to promote the long term success of AIGFP;

3. To focus AIGFP on success measured not only by revenue growth but also by return on capital, quality of earnings, and enhancement of the AIG name and reputation in financial services;

4. To serve as an investment opportunity that will attract the most talented people to AIGFP and to retain those already here; and

5. To be simple, straightforward and efficient.

Under the existing arrangement with AIG, Distributable Income is paid each year on the basis of 70% to AIG and 30% to AIGFP employees. Under the Plan a portion of the Distributable Income, apportioned 70% from AIG and 30% from AIGFP Executives, will not be paid currently but instead will be retained by AIGFP. Such retention will form part of the capital base of AIGFP and, absent losses which exhaust

current revenues and reserves, will be paid subsequently to participants according to a schedule tied to the duration of AIGFP's business.  The Plan will be administered so that the amounts retained under the Plan will be apportioned between AIG and AIGFP Executives on a 70%/30% basis.

SECTION 1

DEFINITIONS

For purposes of this Deferred Compensation Plan:

1.01     "Accredited Investor" shall mean an individual who meets the requirements of an "accredited investor" as that term is defined under Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended.

1.02.    "Beneficiary" shall mean such person or trustee as may be designated by a Participant pursuant to Section 3.01 of this Deferred Compensation Plan.

1.03.    "Board" shall mean the Board of Directors of AIG Financial Products Corp.

1.04     "Business Day" shall mean any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in New York City and London.

1.05.    "Committee" shall mean a committee consisting of the chief executive officer of AIG Financial Products Corp., the chief operating officer of AIG Financial Products Corp., the chief financial officer of AIG Financial Products Corp. and the secretary of AIG Financial Products Corp.

1.06.    "Deferred Compensation" shall mean, with respect to each deferral, (i) as applied to each Participant, the portion of the Participant's Notional Bonus Amount that is deferred by AIGFP pursuant to Section 3 of this Deferred Compensation Plan, including both amounts subject to automatic deferral and voluntary deferrals and (ii) as applied to AIG, the amount of annual Distributable Income of AIGFP

-3-

that is otherwise payable by AIGFP to AIG that is subject to automatic deferral pursuant to Section 3 of this Deferred Compensation Plan.

1.07.    "Deferred Compensation Account" shall mean the account established on AIG Financial Product Corp.'s books in the name of each Participant and of AIG in which, pursuant to Section 3 of this Deferred Compensation Plan, Deferred Compensation amounts are credited to such Participants and to AIG.

1.08.    "Distributable Income" shall mean, with respect to any financial year of AIGFP, revenues, less expenses and credit and market reserves taken for that year, as the same shall be determined by the Board from time to time.

1.09.    "Executive" shall mean an executive employee of AIGFP (excluding, at the discretion of the Committee, any employee for whom AIGFP's Tokyo office is the principal workplace) with the title of Assistant Vice President or higher who is designated by the Board to participate in or be eligible to participate in this Plan.

1.10.    "LIBOR Rate" shall mean the rate for an Interest Reset Date which is the rate for deposits in U.S. Dollars for a period of three (3) months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two London Banking Days preceding that Interest Reset Date. If such rate does not appear on the Telerate Page 375O, the rate for that Interest Reset Date shall be determined in accordance with the definition of USD-LIBOR-Reference Banks.

1.11.    "London Banking Day" shall mean any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

1.12    "Notional Bonus Amount" shall mean, for each Participant in respect of any calendar year, the total notional bonus amount awarded to the Participant from all AIGFP companies, consisting of a cash bonus amount that is paid currently and an amount of Deferred Compensation that is credited

-4-

by AIGFP to the Participant's Deferred Compensation Account and distributed to the Participant on a deferred basis subject to and in accordance with the terms hereof.

1.13.    "Participant" shall mean an Executive who is participating in this Deferred Compensation Plan.

1.14.    "Permanent Disability" shall mean that a Participant has been found to be disabled by the U.S. Social Security Administration.  The date of such a disability will be the date on which that Social Security determination is rendered, not the earlier date as of which the disability commenced.  If the Participant is not covered by the U.S. Social Security system, the Participant shall be considered permanently disabled on the first anniversary of the commencement of his or her disability if the Committee determines before then that the Participant has satisfied the U.S. Social Security definition of disability and the Participant remains continuously disabled through that first anniversary.

1.15.    "Reference Banks" shall mean four major banks in the London interbank market.

1.16.    "USD-LIBOR-Reference Banks" shall mean that the rate for an Interest Reset Date will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the Reference Banks at approximately 11:00 a.m., London time, on the date that is two London Banking Days preceding that Interest Reset Date to prime banks in the London interbank market for a period of three (3) months commencing on that Interest Reset Date.  AIGFP will request the principal London office of each of the Reference Banks to provide a quotation of its rate.  If at least two such quotations are provided, the rate for that Interest Reset Date will be the arithmetic mean of the quotations.  If fewer than two quotations are provided as requested, the rate for that Interest Reset Date will be the arithmetic mean of the rates quoted by major banks in New York City, selected by AIGFP, at approximately 11:00 a.m., New York City time, on that Interest Reset Date for loans in U.S. Dollars to leading European banks for a period of three (3) months commencing on that Interest Reset Date.

-5-

SECTION 2

<u>PARTICIPATION</u>

2.01.   <u>Participation</u>.

(a)    <u>Participation by Executives</u>.   Each Executive shall be entitled to participate in this Deferred Compensation Plan provided that the Executive is an Accredited Investor as of the date Deferred Compensation would be credited to the Executive's Deferred Compensation Account in accordance with the terms hereof.   Participation by an Executive who is an Accredited Investor as of the date Deferred Compensation is credited to the Executive's Deferred Compensation Account and to whom AIGFP awards a Notional Bonus Amount in excess of the level referred to in Schedule A shall be mandatory.   An Executive's participation in this Deferred Compensation Plan shall commence as of the date the Executive elects to, or pursuant to the preceding sentence is required to, participate in this Deferred Compensation Plan.

(b)    <u>Participation by AIG</u>.   AIG's participation in the Deferred Compensation Plan shall be mandatory in an amount determined in accordance with Section 3.01(a).

SECTION 3

DEFERRED COMPENSATION

3.01.    Participants' Deferred Compensation.

(a)    Automatic Deferrals.  (i) Participants indicated on Schedule A shall have the portion of their Notional Bonus Amount indicated on Schedule A deferred automatically; and (ii) AIG shall have a portion of AIGFP's annual Distributable Income that is otherwise payable to AIG by AIGFP deferred automatically, which portion, for any year, shall be equal to: (A)(1) the aggregate amount of Deferred Compensation contributed by all Participants in respect of such year (whether as an automatic deferral pursuant to this Section 3.01(a) or a voluntary deferral pursuant to Section 3.01(b)), plus (2) the aggregate amount notionally credited to all participants in any retirement plan in which members of AIGFP's Tokyo office participate in lieu of participating in this Deferred Compensation Plan (collectively, the "Japanese Plan") in respect of such year, plus (3) the aggregate amount credited to the Deferred Compensation Accounts of all Participants (excluding Deferred Compensation contributions in respect of such year referred to in subclause (A)(1) above), plus (4) the aggregate amount notionally credited to all Japanese Plan participants (excluding amounts notionally credited in respect of such year referred to in subclause (A)(2) above) multiplied by (B) a fraction, the numerator of which is 7 and the denominator of which is 3, minus (C) the aggregate amount credited to AIG's Deferred Compensation Account as of the date of determination.

(b)    Voluntary Deferrals.  Except as provided below, any Participant in this Deferred Compensation Plan may elect to increase the portion of his Notional Bonus Amount that is deferred by AIGFP on the Participant's behalf as Deferred Compensation by completing the election form set forth in Appendix A hereto and delivering such form to the Chief Financial Officer of AIGFP; provided, however, that any Participant who was employed by AIGTG during 2003 shall not be permitted to make

any voluntary deferral of his Notional Bonus Amount pursuant to this Section 3.01(b) for 2003. A Participant may elect to defer up to one hundred percent (100%) of his Notional Bonus Amount. A Participant must submit an election form for a calendar year not later than the earlier of May 30 in such year or two (2) Business Days prior to the date the Participant is notified of his Notional Bonus Amount for the year. Elections made during the calendar year will be honored only if (i) the Participant performs service continuously for AIGFP from the beginning of the calendar year through the date of the election and (ii) at the time of the election, it is not substantially certain that the Participant will receive a then calculable Notional Bonus Amount for the year. To the extent, if any, permitted under Internal Revenue Code Section 409A, an otherwise valid election made during the year will be honored as to the balance of the Notional Bonus Amount, if any, that then is neither substantially certain to be paid nor calculable. In addition, a Participant who first becomes entitled to participate in this Plan and who has not theretofore become eligible to participate in any other plans that would be aggregated with it for Internal Revenue Code Section 409A purposes, may make an election with respect to such calendar year within the first fifteen (15) Business Days after the date such Participant first became entitled to participate, but only with respect to the percentage of his Notional Bonus Amount determined by dividing the days in the calendar year following his eligibility date into the days in the calendar year following his election. A new election form must be filled out by a Participant for each calendar year. The failure of any Participant to fill out an election form shall result in such Participant being deemed to have elected not to defer any portion of the Participant's Notional Bonus Amount in excess of the portion that is automatically deferred as set forth in Schedule A. A Participant for whom AIGFP's Paris office is the principal workplace shall not be permitted to make any voluntary deferral of Notional Bonus Amounts that are awarded in respect of the Participants' employment by Banque AIG.

-8-

(c)    <u>General Rules</u>.  Each Participant may also designate a Beneficiary or Beneficiaries or, if none is designated, such Beneficiary shall be the Participant's estate.  Any designation of Beneficiary made on an election form shall override any previous designation of Beneficiary made by the Participant.  The combination of the portion of a Participant's Notional Bonus Amount that is automatically deferred as set forth in Schedule A, plus any additional portion that the Participant elects to defer on the election form as set forth in (b) above, shall constitute such Participant's Deferred Compensation for the calendar year in respect of which the Notional Bonus Amount was awarded.

3.02.    <u>Determination of Benefit</u>.  AIGFP shall (i) on December 31 of the year in respect of which a Participant's Notional Bonus Amount is awarded, credit the Participant's Deferred Compensation Account with the amount of such Participant's Deferred Compensation for such year and (ii) on each date that AIG's share of AIGFP's Distributable Income in respect of each financial year is paid to AIG by AIGFP, credit AIG's Deferred Compensation Account with the amount of AIG's Deferred Compensation for such year.

3.03.    <u>Interest on Deferred Compensation</u>.  Amounts attributable to a Participant's and to AIG's Deferred Compensation Account shall earn interest, which shall be determined quarterly on the 1st day of each January, April, July and October in each year (each, an "Interest Reset Date"); provided, however, that if any Interest Reset Date would otherwise fall on a day that is not a Business Day, such Interest Reset Date will be the following day that is a Business Day.  The interest rate shall be equal to the LIBOR Rate for each Interest Reset Date.  Each such adjusted rate shall be applicable from and including the Interest Reset Date to which it relates to but not including the next succeeding Interest Reset Date or until all amounts in a Participant's or AIG's Deferred Compensation Account are distributed (each, an "Interest Period").  Interest shall be payable quarterly in arrears not later than ten (10) Business Days following the end of each Interest Period (each such date on which interest is paid, an

"Interest Payment Date") on the balance in such Deferred Compensation Account as of the Interest Reset Date on which the Interest Period commences (but after giving effect to any reduction in such balance for amounts distributed from the Deferred Compensation Account on or prior to the Interest Payment Date with respect to the preceding Interest Period); provided that the Interest Payment Date for the Interest Period beginning in October of each year shall be the date on which cash bonuses for such year are paid if such bonus payment date falls in the subsequent Interest Period (and otherwise shall be as specified above for each other Interest Period).  All amounts of interest shall be paid net of any taxes required by law to be withheld by AIGFP.  For the avoidance of doubt, interest on Deferred Compensation shall be an expense of AIGFP and, accordingly, shall be borne by AIG and AIGFP employees on a 70%/30% basis as a reduction in Distributable Income.

3.04    Additional Return Payment to AIGFP Executives.  In addition to interest payable on Deferred Compensation in accordance with Section 3.03, the Deferred Compensation Accounts of Participants (but not AIG) may be credited as of the Interest Reset Date falling in January of each year (or, if earlier, on the Interest Payment Date for the Interest Period beginning in October of the preceding year) with such additional earnings of AIGFP (the "Additional Return Payment") as the President of AIGFP, with the approval of the Board, shall determine; provided that any Additional Return Payments (i) shall be payable only to Participants who are employees of AIGFP as of the date of payment therefor and (ii) shall be allocated among such eligible Participants' Deferred Compensation Accounts on a pro rata basis.  Additional Return Payments shall be paid to eligible Participants on each Interest Payment Date for the Interest Period beginning in October of each year based on the balance in such Participants' Deferred Compensation Accounts as of the Interest Reset Date for the Interest Period beginning in October of such year.  For the avoidance of doubt, Additional Return Payments shall be paid out of the

30% portion of annual Distributable Income that is allocable to AIGFP employees.  All Additional Return Payments shall be paid net of any taxes required by law to be withheld by AIGFP.

      3.05.  <u>Payment of Benefit</u>.

      (a)      <u>Distribution Events</u>.  Upon the earlier to occur of the Distribution Events set forth below, AIGFP shall direct that all amounts credited to a Participant's Deferred Compensation Account shall be paid in a lump sum to such Participant.  The Distribution Events are:

      (a)      Death of the Participant; or

      (b)      Permanent Disability of the Participant.

Upon the death of a Participant prior to his receipt of all amounts credited to his Deferred Compensation Account, his Beneficiary shall be paid in a lump sum all amounts then credited to such Participant's Deferred Compensation Account, plus accrued but unpaid interest to the date of payment.  If there is more than one Beneficiary then designated, such Account shall be distributed to such Beneficiaries in the proportions designated by such Participant, or in the absence of any such designation, in equal shares. Any payment made pursuant to this Section 3.05(a) shall be made in the calendar year in which the Death or Permanent Disability (as applicable) of the Participant occurs or such later date as may be permitted under Internal Revenue Code Section 409A without the Participant incurring any taxes or interest or penalties thereunder.

      (b)      <u>Installment Payments</u>.  Except as provided below, amounts in the Participant's Deferred Compensation Account attributable to Deferred Compensation contributions shall be paid to such Participant and to AIG annually in arrears on the Interest Payment Date for the Interest Period beginning in October of each year in equal pro rata installments ("Installment Payments") over a period of time (the "Distribution Period") corresponding to the approximate average life of AIGFP's swap transaction portfolio, as last determined by the Board before the beginning of the calendar year preceding the date of

-11-

the Deferred Compensation contribution.  However, for calendar year 2009 and 2010, the period of time that shall be used is six years, and as to Deferred Compensation contributions made prior to 2009, the installment schedule established under this section as in effect prior to December 31, 2008 shall remain applicable.  The Distribution Period for a Deferred Compensation contribution shall commence on the Interest Reset Date in January of the calendar year next succeeding the calendar year in respect of which the Deferred Compensation contribution was made, with the first Installment Payment therefore being distributed on the Interest Payment Date for the Interest Period beginning in October of the calendar year in which the Distribution Period commences.  Installment Payments shall be paid net of any taxes required by law to be withheld by AIGFP.

(c)    <u>Early Distribution</u>.  In addition to the foregoing, to the extent and in the manner permitted under Section 409A(a)(2) of the Internal Revenue Code, amounts credited to a Participant's or to AIG's Deferred Compensation Account may be distributed on such earlier date as determined by the Committee, with the approval of the Board; provided that (i) except as set forth in (ii) and (iii) below, any such early distributions shall be made from Participants' and AIG's Deferred Compensation Accounts on a pro rata basis, (ii) any such early distributions can be made from AIG's Deferred Compensation Account in an amount such that, after giving effect to such distribution, the aggregate amount credited to AIG's Deferred Compensation Account shall equal 70% of the aggregate amount credited to the sum of (a) the Deferred Compensation Accounts of AIG and all Participants taken together, plus (b) the aggregate amount notionally credited to all Japanese Plan participants and (iii) a settlement of the entire balance in a Participant's Deferred Compensation Account can be agreed to by the Committee, with the approval of the Board, in connection with the termination of a Participant's employment with the Company.

(d)      <u>Foreign Currency Alternative</u>.  Participants who are employed outside the United States may elect to have the Installment Payments and the interest payments (but not the Additional Return Payments) on their annual Deferred Compensation contribution paid in the currency in which their cash bonuses are paid in lieu of U.S. Dollars (provided such currency is one of Yen, Euro, Pounds Sterling and Hong Kong Dollars).  In the event a Participant shall make such an election, then the applicable Deferred Compensation contribution shall be converted from U.S. Dollars into the applicable foreign currency at the spot foreign exchange rate at or about 11:00 a.m. (New York time) on the date such contribution is deemed pursuant to Section 3.02 to have been credited to the Participant's account, as determined in good faith by AIGFP.  Such translated Deferred Compensation amount shall then earn interest in accordance with Section 3.03 except that the applicable interest rate shall be the equivalent three-month LIBOR rate in the alternative designated currency.  Participant elections shall be made not later than December 1 of the year in which the Deferred Compensation contribution has been made, by submitting an election form in the form of Appendix A to the Chief Financial Officer of AIGFP.

(e)      <u>General</u>.  All payments of interest, Installment Payments and Additional Return Payments, and any early distribution of amounts credited to a Participant's Deferred Compensation Account, shall be paid to such Participants from the company or companies from which such payment represents compensation for services provided by such Participant; provided that for Participants whose employment has been transferred from an AIGTG group company to an AIG Financial Products Corp. group company in the same country, all such payments shall be paid from the AIG Financial Products Corp. group company to which the Participant has been transferred.

SECTION 4

MISCELLANEOUS

4.01.    AIGFP's Liability.

(a)  The benefits payable hereunder shall constitute an unsecured debt of AIG Financial Products Corp. to the Participants and their Beneficiaries and to AIG and shall not have the benefit of any guarantee by AIG of payment obligations of AIG Financial Products Corp.  For the avoidance of doubt, and notwithstanding anything else contained herein to the contrary, (i) the payment of benefits payable hereunder to each of the Participants and their Beneficiaries and to AIG shall be made only from the general funds of AIG Financial Products Corp., (ii) AIG Financial Products Corp. shall not segregate or earmark any of its assets nor hold any assets in trust or in any special account for this purpose, and (iii) none of the Participants, the Participants' Beneficiaries or AIG shall have any legal or equitable interest in, lien on, or claim to, any particular asset of AIG Financial Products Corp. by virtue of this Deferred Compensation Plan.  If AIG Financial Products Corp. shall become the subject of any bankruptcy or insolvency case or proceeding, or shall make an assignment for the benefit of creditors, or shall become the subject of a  reorganization whether or not pursuant to bankruptcy laws, or if any other relief shall be granted to AIG Financial Products Corp. generally from the rights of creditors, then in any such event (a "Bankruptcy/Insolvency Event") the obligations under this Deferred Compensation Plan to Participants and their Beneficiaries and to AIG shall be subordinate and junior in right of payment and otherwise, to the prior payment in full of all of the other obligations of AIG Financial Products Corp., whether now

-14-

existing or hereafter incurred, except to the extent payment of any such obligations is expressly made subordinate to or *pari passu* with the payment obligations hereunder.  If, in connection with a Bankruptcy/Insolvency Event, the claims (collectively "Creditors' Claims") of all other present and future creditors of AIG Financial Products Corp., other than those claims that are expressly made subordinate to or *pari passu* with claims for benefits payable hereunder, can be immediately fully satisfied, or adequate provision made for them, payments will be made at the times specified in this Plan.  If, in connection with a Bankruptcy/Insolvency Event, Creditors' Claims cannot be immediately satisfied or provision made for them, then during the period prior to such condition being satisfied   ("the Delay Period"), the following special rules shall apply:   AIG Financial Products Corp. will try to satisfy or provide for Creditors' Claims as soon as reasonably practicable so as to minimize Delay Period restrictions.  During the Delay Period, no benefit payments shall be made.  For the calendar year in which the Delay Period ends, (1) any payments that first became due during that calendar year will be paid by the end of that year or, if later,  within 75 days after the date they first became due, and (2) any payments that first became due in an earlier calendar year will be paid to the extent doing so would not violate Internal Revenue Code Section 409A (e.g., because paying them in any earlier year in the Delay Period would have jeopardized AIG Financial Products Corp.'s ability to continue in business as a going concern).  The right to any other payment that first became due during the Delay Period shall lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for its payment without violating Internal Revenue Code Section 409A.

(b)  The outstanding balance credited to the Deferred Compensation Accounts of each Participant and of AIG shall be subject to reduction, from time to time, to the extent of any losses incurred (i) by AIGFP (excluding AIGTG) or (ii) by AIGTG resulting from transactions entered into on or after January

-15-

1, 2003, which losses in the case of (i) and (ii) for any year in the aggregate exceed the outstanding market and credit reserves and current year income of AIGFP (excluding outstanding market and credit reserves relating to transactions entered into by AIGTG before January 1, 2003), but before base capital of AIGFP (for the avoidance of doubt including AIGTG, and consisting of equity, retained earnings, if any, and subordinated debt).   Such reductions shall be made among the Participants (including for this purpose, participants in the Japanese Plan) and AIG on a pro rata basis.   AIG Financial Products Corp. shall be obligated subsequently to restore amounts so deducted from Participants' and AIG's account balances, plus accrued interest thereon at the interest rate determined in accordance with Section 3.03 and, in connection therewith, the Board shall adopt a plan (which shall not be subject to the approval of AIG or the Participants) setting forth a schedule under which AIG Financial Products Corp. shall restore amounts deducted from Participants' and AIG's account balances (plus accrued interest thereon).   Any such restoration plan shall provide that any restored amounts shall be paid in 2013; to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A.Notwithstanding the terms of any such plan, in a bankruptcy or insolvency of AIG Financial Products Corp. each Participant and Participant's Beneficiary and AIG shall have an unsecured claim, subordinated and junior in payment and subject to the limitation on rights and interests to the extent provided in the immediately preceding subparagraph, against AIG Financial Products Corp. for the amount, if any, by which the balances credited to their Deferred Compensation Account were reduced and not subsequently restored (plus credit for accrued interest thereon), in addition to such claims as are described in the immediately preceding subparagraph.   For the avoidance of doubt, if AIG Financial Products Corp. consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its assets to, another

-16-

entity, then the resulting, surviving or transferee entity shall assume all of the obligations of AIG Financial Products Corp. hereunder.

4.02.   <u>Nonassignability</u>.   Subject to Section 3.05(c)(iii), neither AIG nor any Participant or Beneficiary shall have the power to subject any right to receive payments under this Deferred Compensation Plan to assignment, pledge, sale, attachment, garnishment or any other transfer, alienation or encumbrance, nor shall such rights be subject to AIG's, the Participant's or Beneficiary's debts or to seizure for satisfaction of judgments, alimony or separate maintenance obligations.

4.03.   <u>Continuation as Employee</u>.   Neither this Deferred Compensation Plan nor the payment of any benefits hereunder shall be construed as giving the Participant any right to be retained as an employee of AIGFP.   Except as provided in the next sentence, Participants who cease to be employees of AIGFP shall not lose their Deferred Compensation, which shall continue to be distributed as provided in Section 3.05 and to earn interest as provided in Section 3.03 (but not Additional Return Payments pursuant to Section 3.04).   Notwithstanding any provision herein to the contrary, Participants who steal or embezzle from AIG or AIGFP or engage in an act of dishonesty, disloyalty or breach of trust against AIG or AIGFP that is comparable to theft or embezzlement shall lose their right to Deferred Compensation, including all amounts then credited to their Deferred Compensation Account and any interest accrued thereon.

4.04.   <u>Amendment and Termination</u>.   The Committee may from time to time, with the approval of the Board, amend this Deferred Compensation Plan in whole or in part; provided, however, that any such amendment (i) shall be effective as of the next succeeding Interest Reset Date falling in January (other than an amendment to this Deferred Compensation Plan that (a) has the effect of altering or eliminating the voluntary deferral rights of Participants under Section

3.01(b) hereof or of reducing the portion of Participants' Notional Bonus Amount that is subject to automatic deferral under Section 3.01(a) hereof, or (b) is adopted in connection with the adoption or proposed adoption of, or a change or anticipated change in, any federal, state or other law or regulation (including any tax law or regulation) applicable to the Deferred Compensation Plan; any such amendment described in such clause (a) or (b) shall be effective immediately or as otherwise specified therein) and (ii) cannot, subject to Section 4.01 hereof, reduce or delay payment of any Participant's or AIG's benefits accrued up to the date of such amendment. The Committee shall promptly notify all Participants and AIG of any amendments to this Deferred Compensation Plan. The Board may suspend or terminate this Deferred Compensation Plan; provided, however, that any such suspension or termination cannot, subject to Section 4.01 hereof, reduce or delay payment of any Participant's or AIG's benefits accrued up to the date of such suspension or termination. Such amendment, suspension or termination shall not be effective until made in writing and shall be communicated in writing to all Participants and to AIG.

4.05.    <u>Governing Law</u>.  The law of the State of Connecticut shall govern the interpretation, application and operation of this Deferred Compensation Plan.

4.06.    Claims Procedure.  Claims for benefits under the Plan shall be filed with the Committee, on forms supplied by the Committee.  Written notice of the Committee's disposition of a claim shall be furnished to the claimant within 30 days after the application therefor is filed.  In the event the claim is denied the reasons for the denial shall be specifically set forth in writing, pertinent provisions of the Deferred Compensation Plan shall be cited, and, where appropriate, an explanation as to how the

claimant can perfect the claims will be provided.  If AIG, a Participant or a Beneficiary has been denied a benefit, each shall be entitled, upon request to the Board, to appeal the denial of the claimed benefit within 90 days following the Committee's determination described in the preceding sentence.  Upon such appeal, the Board (or a special committee designated by the Board) shall, as soon as practicable, meet with and hear the position of the claimant.  Its decision following such meeting shall be made within 30 days and shall be communicated in writing to the claimant.  Participants (i) may file suit for purposes of making any claim arising out of or relating to the Deferred Compensation Plan only in the United States District Court for the District of Connecticut, which shall have the exclusive jurisdiction to hear and determine all claims by Participants arising out of or relating to the Deferred Compensation Plan, and (ii) for the avoidance of doubt, may not otherwise institute judicial, administrative or other proceedings or actions in any other venue for such purposes; provided, however, that if the United States District Court for the District of Connecticut lacks subject matter jurisdiction in respect of any such claim made by a Participant, such Participant may file suit only in the Connecticut Superior Court for Fairfield County, which shall have the exclusive jurisdiction to hear and determine such claim; provided further, for the avoidance of doubt, that no such suit may be filed in either court by a Participant until the Participant has exhausted the claims procedure set forth in this Section 4.06 in respect of the claim in question.

4.07    Information.  For so long as the Deferred Compensation Plan is in effect, AIGFP shall provide each Participant and AIG with quarterly Deferred Compensation account statements setting forth (i) the Participant's or AIG's (as the case may be) Deferred Compensation account balance, (ii) the amount of interest and, for account statements covering the quarterly period in which such amounts would be paid, the Additional Return Payment and Installment Payment, if any, paid on such balance during such quarterly period and (iii) the Installment Payment schedule for the Participant or AIG.  In addition, AIGFP shall provide Participants and AIG with an AIGFP annual financial summary (which

shall include a statement of the average life of AIGFP's swap transaction portfolio as of the date of such financial information), and shall endeavor to keep Participants who are then employees of AIGFP apprised of material developments involving AIGFP's business or accounting procedures applicable to AIGFP insofar as they relate to the Deferred Compensation Plan.  A form of quarterly statement is attached as Appendix B hereto.

      4.08    <u>Singapore Office Participants</u>.  Notwithstanding any other provision of the Plan to the contrary, Participants who are based in a Singapore office of AIGFP shall have their automatic and voluntary deferrals contributed to their Deferred Compensation Account on an after tax basis after deducting Singapore taxes payable in respect of such Participants' Notional Bonus Amount.

      4.09    <u>Compliance with Internal Revenue Code Section 409A</u>.  It is intended that amounts awarded or deferred under this Plan will not be taxable under Internal Revenue Code Section 409A.  This Plan shall be interpreted and administered, to the extent possible, in a manner that does not result in a "plan failure" (within the meaning of Internal Revenue Code Section 409A(a)(1)) of this Plan or any other plan or arrangement maintained by AIG-FP or any affiliate.

      4.10    <u>Foreign Participants not Subject to U.S. Taxation</u>.  If a Participant is not subject to U.S. income taxation on any benefits under this Plan or any other plan that would be aggregated with it for purposes of applying Internal Revenue Code Section 409A, the Participant's rights will be determined under either the Plan terms in effect immediately before the December 2008 restatement of the Plan or the terms in effect immediately after such restatement, whichever is more favorable to such Participant as determined by the Committee.  Such a Participant shall not accrue any further benefits under this Plan (or any other plan that would be aggregated with this Plan for purposes of Section 409A) to the extent such

benefits would be subject to Internal Revenue Code Section 409A, and any benefits that cannot be accrued for that reason will be paid in another way, if any, that is not subject to Section 409A.

APPENDIX A

AIG FINANCIAL PRODUCTS CORP.
DEFERRED COMPENSATION PLAN
ELECTION FORM

1.  Pursuant to the provisions of Section 3 of the Deferred Compensation Plan, in addition to the automatic deferral under the Plan I hereby elect to have the amount or percentage of amounts specified below deferred in the manner provided for in the Deferred Compensation Plan (see Section 3.01(b) for restrictions applicable to members of the Paris office):

_____   USD   Amount to be deferred as a voluntary deferral in addition to the automatic deferral under the Plan (to the extent I am awarded a Notional Bonus Amount that is sufficient to cover this voluntary deferral amount).

_____   USD   Any Notional Bonus Amount awarded to me in excess of this amount (that is not subject to automatic deferral under the Plan) should be treated as a voluntary deferral.

_____   %   This percentage of the Notional Bonus Amount remaining after the automatic deferral should be treated as a voluntary deferral.

2.  In the event that I should die prior to receipt of all distributions to which I am entitled under the Deferred Compensation Plan, I hereby direct that, pursuant to Section 3.05 of the Deferred Compensation Plan, all amounts due to me as deferred compensation under Section 3 of the Deferred Compensation Plan be distributed as follows:

Proportion                    Name of Beneficiary(ies)

_____          _____

_____          _____

_____          _____

3.  I hereby elect, pursuant to Section 3.05 (d) of the Deferred Compensation Plan, to have the Installment Payments and interest payments in respect of my Deferred Compensation contribution for calendar year _____ paid in _____ [specify foreign currency] in lieu of U.S. Dollars.

_____     _____     _____
Date                     Signature                                    Name (Please Print)

APPENDIX B

DEFERRED COMPENSATION
ACCOUNT STATEMENT
FOR QUARTERLY PERIOD ENDING _____

The Deferred Compensation balance in your account is an unsecured subordinated liability of AIG Financial Products Corp. to you and your beneficiaries.  See Section 4.01 of the AIGFP Deferred Compensation Plan for additional details.

The details of your account balance for the current year are as follows:

| | **In USD** | **In Local Currency**<br>(_____) |
|---|---|---|
| Deferred Compensation Balance January 1, _____ | | |
| Year Generated  _____ | _____ | _____ |
| Installment Payments | | |
| Year Generated  _____ | _____ | _____ |
| Deferred Compensation Balance December 31, _____ | | |
| Year Generated  _____ | _____ | _____ |

| Interest Earned: | | |
|---|---|---|
| First Quarter | | _____ |
| Second Quarter | | _____ |
| Third Quarter | | _____ |
| Fourth Quarter | | _____ |
| Additional Return Payments | _____ | _____ |
| Total Earnings | | _____ |

SCHEDULE A

AUTOMATIC DEFERRALS

| Position | Notional Bonus Amounts |
| --- | --- |
| AIGFP Executives with Notional Bonus Amounts Exceeding $250,000 | 10% of first $500,000 |
| | 20% of next $250,000 |
| | 30% of next $250,000 |
| | 40% of next $250,000 |
| | 50% of remainder |